**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| S.B., Individually, on Behalf of and as Parent and Next Friend of J.B., a Minor, Plaintiffs, | ) | |
| v. | ) | Case No. 1:26-cv-1907 |
| Jennings County School Corporation, Defendant. | ) | |

**COMPLAINT AND DEMAND FOR TRIAL BY JURY**

COME NOW Plaintiffs S.B., Individually, on Behalf of, and as Parent and Next Friend of J.B. (collectively, "Plaintiffs"), and for their Complaint against Defendant Jennings County School Corporation ("Defendant" or "Jennings County"), allege as follows:

## I. JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States, including the Fourteenth Amendment to the United States Constitution; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and 42 U.S.C. § 1983.
2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.
3. Plaintiffs have satisfied or are exempt from any exhaustion requirements under the Individuals with Disabilities Education Act pursuant to 20 U.S.C. § 1415(l) and *Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017), because the core of this Complaint seeks relief unavailable under

the IDEA, including compensatory damages for disability discrimination, retaliation, and intentional infliction of emotional distress.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the events giving rise to this Complaint occurred within the Southern District of Indiana.

## II. PARTIES

5. Plaintiff J.B. is a minor child with disabilities previously enrolled in the sixth grade at Scipio Elementary School within Jennings County School Corporation.

6. Plaintiff S.B. is J.B.'s mother and legal guardian and brings this action on his behalf and in her individual capacity.

7. Defendant Jennings County School Corporation is a public school corporation organized under Indiana law, a recipient of federal financial assistance, and a public entity within the meaning of Title II of the ADA.

## III. COMPLIANCE WITH STATUTORY NOTICE REQUIREMENTS

8. On June 9, 2026, through their undersigned counsel, Plaintiffs issued a written *Notice of Tort Claim* pursuant to the Indiana Tort Claims Act ("ITCA"), Ind. Code § 34-13-3-10 et seq., and the Indiana Claims Against Public Schools Act ("CAPSA"), Ind. Code § 34-13-3.5-4 (the "*Tort Claim Notice*").

9. The *Tort Claim Notice* was addressed to Dr. Nicole Johnson in her capacity at Jennings County School Corporation, 34 Main Street, North Vernon, IN

47265, and to the Indiana Office of the Attorney General and the Indiana Political Subdivision Risk Management Commission.

10. The *Tort Claim Notice* identified the claimants; described the factual circumstances giving rise to the claim, including Jennings' repeated discipline of J.B. for behaviors that are manifestations of his disability and Jennings' differential treatment of J.B. on the basis of disability; identified the categories of legal claims contemplated, including violations of the Fourteenth Amendment, 42 U.S.C. § 1983, the ADA, Section 504, the IDEA, and state tort law; and set forth a specific request for relief consisting of actual, emotional, and pecuniary damages, additional damages for pain and suffering, lost wages, and educational placement for the Student.

11. The *Tort Claim Notice* was served on Jennings by certified mail, return receipt requested. Jennings received the *Tort Claim Notice* on June 12, 2026, as confirmed by the executed United States Postal Service Domestic Return Receipt (Article & USPS Tracking Number: 7017 3040 0001 1303 9780), signed by Cathy Hyden, Jennings' Special Education Secretary/Central Office Receptionist as an authorized agent for Dr. Nicole Johnson.

12. More than fifteen (15) days elapsed between Jennings' receipt of the *Tort Claim Notice* on June 12, 2026 and the filing of this action. Jennings did not remedy the alleged violation, and Jennings did not make any written offer to resolve the dispute, within the fifteen-day period required by Ind.

Code § 34-13-3.5-6. The CAPSA prerequisite to suit set forth in Ind. Code § 34-13-3.5-4 has been satisfied.

13. More than ninety (90) days similarly elapsed between Jennings' receipt of the *Tort Claim Notice* on June 12, 2026, and the filing of this action. Jennings failed to approve or deny the claim within the ninety-day period set forth in Ind. Code § 34-13-3-11, and the claim is therefore deemed denied by operation of law. The ITCA prerequisite to suit set forth in Ind. Code § 34-13-3-13 has been satisfied. To the extent any state law claim of J.B. is subject to additional procedural compliance, Plaintiffs further allege that J.B.'s status as a minor renders him "incapacitated" for purposes of Ind. Code § 34-13-3-9, tolling any otherwise applicable notice period.

## III. FACTS APPLICABLE TO ALL COUNTS

14. J.B. has been diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD), Disruptive Mood Dysregulation Disorder (DMDD), anxiety, depression, separation anxiety, Oppositional Defiant Disorder (ODD), Obsessive-Compulsive Disorder (OCD), insomnia, and significant difficulties with impulse control, all of which substantially limit major life activities.

15. At all relevant times, Defendant was aware of J.B.'s disabilities and educational needs. J.B. had an active Section 504 Plan, and his parents repeatedly and directly notified the School of his diagnoses and disability-related struggles.

16. Despite this awareness, Defendant failed to provide appropriate accommodations, behavioral supports, or special education services. Defendant failed to develop an IEP and failed to meaningfully implement J.B.'s 504 Plan.

17. For approximately two (2) years prior to the events described herein, Defendant engaged in a pattern of removing J.B. from class and sending him home for behaviors that were minor or directly related to his disabilities, pressuring Parent, S.B., to pick him up early or accept suspensions, and restricting his access to classes and school activities.

18. J.B. was subjected to severe and sustained disability-based peer harassment, including repeated statements by other students urging him to kill himself. This harassment caused J.B. to come home crying for months and to express self-harm ideation. Defendant was made aware of this harassment through multiple parental reports over an extended period and failed to meaningfully intervene.

19. When J.B. attempted to report bullying, school staff responded by telling him to "shut up and sit down" or removing him from class, recess, the library, or the lunchroom, rather than addressing the conduct of other students.

20. Other students discovered that J.B. had a different learning plan and targeted him on the basis of his disability. Defendant failed to protect J.B. from this disability-based harassment.

21. A teacher who openly expressed hostility toward J.B. subjected him to sustained mistreatment, including failing him across all subjects without legitimate justification. This teacher's conduct caused J.B. to cry every single morning before school. Only after S.B. demanded a meeting and J.B. was removed from her class did his academic performance recover immediately, with J.B. subsequently earning all A's. Defendant failed to investigate, supervise, or remediate this teacher's conduct prior to that intervention.

22. Another school employee repeatedly physically prevented J.B. from entering the school building by holding the door shut against him. This same employee falsely claimed that J.B. had not returned library books, which were later found on the shelves.

23. For several months, another school employee repeatedly discarded J.B.'s breakfast and lunch, telling him he was "too slow to eat." This conduct continued for an extended period before it was discovered. Defendant failed to supervise or discipline the employee responsible.

24. On or about August 26, 2025, Defendant expelled J.B. from school for repeating lyrics to a song. This conduct was a direct manifestation of his disability-related impulsivity. The expulsion was grossly disproportionate, was not applied to nondisabled peers engaged in comparable conduct, and was not preceded by a compliant Manifestation Determination Review Meeting.

25. On the same day the expulsion was imposed, Defendant's administration convened a meeting at which school officials stated that they had observed no bad behaviors from J.B. Despite this acknowledgment, and despite S.B. having provided documentation from J.B.'s treating physician describing the signs and symptoms of each of J.B.'s medical and psychological conditions, including impulsivity, Defendant expelled J.B. from his classes that very day.

26. Defendant thus proceeded with expulsion notwithstanding its own admission that J.B. had not engaged in misconduct and notwithstanding contemporaneous medical documentation establishing that any conduct at issue was a manifestation of his disabilities.

27. The impact of the expulsion on those who knew J.B. was immediate and visible. As S.B. and J.B. left the initial expulsion meeting at the central office, one of J.B.'s teachers asked to see J.B. one last time and walked them to the parking lot. There, the teacher opened S.B.'s car door, in tears, and apologized to J.B. for what was happening, telling him that she was deeply sorry, that the situation was not right or fair, and that she wished she could change the outcome. J.B. and S.B. left the central office that day crying.

28. Defendant failed to provide J.B. with educational services during his expulsion that would enable him to continue participating in the general education curriculum.

29. The pattern of escalating discipline against J.B. intensified following S.B.'s direct confrontation of school administration regarding its failure to protect J.B. from bullying. Staff became visibly upset during that meeting. The adverse treatment of J.B. increased in both frequency and severity in the period immediately following S.B.'s protected advocacy.

30. In or about December 2025, Defendant held a review meeting at which Scipio Elementary School Principal, Melissa Patterson, accused J.B. of operating a YouTube account and using it to make trouble. Principal Patterson further stated that the School had spoken with a law enforcement officer and that the officer had indicated additional criminal charges would be filed against J.B. In fact, no additional charges were ever filed, and no officer ever communicated any such statement to Plaintiffs. When S.B. explained that the account could not have belonged to J.B., Principal Patterson produced a printed screenshot that she claimed was proof, but which established nothing. Principal Patterson went further, stating that she was concerned about the safety of the students and staff and that she did not want J.B. returned to classes at all. Principal Patterson made these accusations and statements directly in front of J.B. and in a rude and demeaning manner. J.B. left the meeting in tears.

31. The criminal charges that were subsequently filed against J.B. have been dropped. The assigned probation officer issued a formal apology to S.B. and J.B. in the presence of counsel, acknowledging that the charges were

unfounded. Notwithstanding this, J.B. has not been permitted to return to school.

32. Pursuant to Indiana Code § 34-13-3-8(a), Plaintiffs served a Notice of Tort Claim upon Jennings County School Corporation on June 3, 2026 . The Notice identified the nature of the claims, the time period of the loss (the 2023–2026 school years), the circumstances giving rise to the claims (Defendant's mistreatment of J.B. as it relates to his disability, failure to protect him from bullying and harassment, failure to implement 504 accommodations, and retaliatory and punitive disciplinary actions including expulsion), the residence of Plaintiffs, the identity of J.B. and his parents, the specific school at which the loss occurred, and the amount of damages sought. This *Complaint* is not being filed until the earlier of: (a) Defendant's denial of the claim in whole or in part; or (b) expiration of the 90-day statutory period under Indiana Code § 34-13-3-11, which runs on September 3, 2026.

33. As a result of Defendant's conduct, J.B. has suffered educational regression, severe and persistent emotional distress, self-harm ideation, loss of access to the benefits of public education, and exacerbation of his underlying disabilities. J.B. has lost the academic and personal progress he worked hard to achieve, and the consequences of the expulsion have permeated every aspect of his life.

34. Since these events began, J.B. has gained a significant amount of weight, increasing from approximately 132 pounds to approximately 220 pounds.

His demeanor toward others and toward life generally has markedly deteriorated. He is profoundly depressed, frightened, and isolated, and his mother is gravely concerned for his mental health and his future. The harm to J.B. has been severe and is likely to be long-lasting, and the turmoil has extended throughout the entire household. Plaintiff S.B. has suffered, and continues to suffer emotional distress, disruption of their caregiving responsibilities, and economic harm.

**COUNT I – TITLE II OF THE AMERICANS WITH DISABILITIES ACT**

35. Plaintiffs incorporate by reference paragraphs 1 through 34.

36. J.B. is a qualified individual with a disability within the meaning of Title II of the ADA.

37. Defendant is a public entity subject to Title II of the ADA.

38. Defendant excluded J.B. from participation in and denied him the benefits of public education by reason of his disabilities, including through repeated classroom exclusions, physical denial of building access, deprivation of meals, and expulsion for disability-related conduct.

39. Defendant failed to make reasonable modifications to its policies, practices, and procedures and instead repeatedly punished J.B. for disability-related behavior.

40. Defendant failed to implement J.B.'s 504 Plan accommodations and provided no FBA-based behavioral supports despite known need.

41. Defendant acted with deliberate indifference to J.B.'s federally protected rights.

42. As such, Plaintiffs suffered and continue to suffer emotional and financial harm.

**COUNT II – SECTION 504 OF THE REHABILITATION ACT**

43. Plaintiffs incorporate by reference paragraphs 1 through 42.
44. Defendant receives federal financial assistance and is subject to Section 504 of the Rehabilitation Act.
45. J.B. is an individual with a disability within the meaning of Section 504.
46. Defendant denied J.B. meaningful access to education solely by reason of his disabilities through a sustained pattern of exclusion, failure to accommodate, and deliberate indifference to disability-based harassment.
47. Defendant acted with bad faith and gross misjudgment in its treatment of J.B., as evidenced by the pervasive and documented nature of its failures over an extended period.
48. As such, Plaintiffs suffered and continue to suffer emotional and financial harm.

**COUNT III – FOURTEENTH AMENDMENT / 42 U.S.C. § 1983**

49. Plaintiffs incorporate by reference paragraphs 1 through 48.
50. Defendant’s employees acted under color of state law at all relevant times.
51. Defendant treated J.B. differently from similarly situated nondisabled students by imposing escalating and extreme disciplinary measures—including expulsion—for conduct that was minor or disability-related,

while nondisabled peers engaged in comparable conduct without equivalent consequences.

52. Defendant lacked any rational basis for this differential treatment, which was instead motivated by disability-based animus and retaliation against parental advocacy.

53. Defendant deprived J.B. of his liberty and property interests in public education without due process of law, including through expulsion without a compliant Manifestation Determination Review Meeting and without adequate procedural protections.

54. Defendant also maintained a widespread practice or custom of discriminating against students with disabilities that was the moving force behind the constitutional violations J.B. suffered. This practice is evidenced not by isolated acts of a single employee, but by a pervasive, coordinated pattern of misconduct spanning multiple employees across different roles and departments, including classroom teachers, building-level administrators, a guidance counselor, a cafeteria employee, and a building access employee, all of whom engaged in or participated in the mistreatment of J.B. over an extended period and without institutional intervention, correction, or discipline.

55. The breadth, duration, and multi-departmental nature of this misconduct supports a reasonable inference that the discriminatory treatment of J.B. reflected a custom or practice so widespread and well-

settled as to constitute de facto policy. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

56. Defendant's deliberate indifference to the known pattern of disability-based mistreatment, its failure to supervise or discipline any participating employee, and its escalation of punitive measures in direct response to parental advocacy further establish that the unconstitutional conduct was the product of official policy or custom attributable to Defendant as a municipal entity. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

57. As such, Plaintiffs suffered and continue to suffer emotional and financial harm.

**COUNT IV – RETALIATION (42 U.S.C. § 1983 / FIRST AMENDMENT)**

58. Plaintiffs incorporate by reference paragraphs 1 through 57.

59. S.B. engaged in protected First Amendment activity by repeatedly reporting disability-based bullying, discrimination, and the School's failure to comply with federal law to school personnel and district administration. These communications concerned matters of public concern, including student safety and institutional compliance with federal disability law.

60. Following S.B.'s direct confrontation of school administration, Defendant subjected J.B. to materially adverse treatment, including escalating exclusions, punitive disciplinary measures, and ultimately expulsion. Each of these actions materially interfered with J.B.'s access to education

and would deter a reasonable person from continuing to exercise First Amendment rights.

61. A causal connection between S.B.'s protected activity and the adverse treatment of J.B. is established by the timing of the escalation, the visible animus displayed by staff during S.B.'s meeting with administration, the reframing of disability-related behaviors as "misconduct" only after complaints were made, and the absence of consistent or legitimate justification for the treatment imposed.

## COUNT V – ASSOCIATIONAL DISCRIMINATION

62. Plaintiffs incorporate by reference paragraphs 1 through 61.

63. Plaintiff S.B. is a person aggrieved within the meaning of 29 U.S.C. § 794a(a)(2) due to Defendant's discrimination based on their association with J.B. and his disabilities.

64. Defendant had actual knowledge of Plaintiffs' association with J.B. and his disabilities at all relevant times.

65. Defendant subjected Plaintiffs to adverse treatment because of that association, including excluding them from meaningful participation in educational decision-making, disregarding and retaliating against their advocacy for appropriate services and legal protections, and escalating adverse actions against J.B. in direct response to parental complaints.

66. Defendant's conduct caused Plaintiff S.B. direct and personal injury, including economic loss and severe emotional distress.

67. As such, Plaintiffs suffered and continue to suffer emotional and financial harm.

**COUNT VI – NEGLIGENT SUPERVISION AND TRAINING**

68. Plaintiffs incorporate by reference paragraphs 1 through 67.

69. Defendant owed a non-delegable duty to supervise and train its employees to act with reasonable care toward students, particularly those with known disabilities. This duty encompassed proper implementation of 504 accommodations; appropriate responses to bullying and disability-related behaviors; and prevention of abusive, discriminatory, or retaliatory employee conduct.

70. Defendant breached that duty through systemic failures in supervision and training, including: failing to train staff on bullying prevention and disability-based harassment; failing to supervise a teacher who failed J.B. across all subjects and subjected him to daily emotional distress; failing to supervise an employee who physically blocked J.B. from the building; failing to prevent an employee from repeatedly discarding J.B.'s meals; and failing to ensure that disciplinary decisions complied with federal disability law.

71. The injuries J.B. and Plaintiffs suffered were the direct and foreseeable result of these failures. Each harm J.B. sustained, emotional, educational, and psychological, flows directly from Defendant's pervasive failure to supervise and train its employees.

72. Defendant's negligent supervision and training was a proximate cause of the significant damages Plaintiffs sustained.

73. As such, Plaintiffs suffered and continue to suffer emotional and financial harm.

## COUNT VII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

74. Plaintiffs incorporate by reference paragraphs 1 through 73.

75. Defendant owed Plaintiffs a duty to exercise reasonable care in the education, supervision, discipline, and accommodation of J.B., a minor student with known disabilities.

76. Defendant breached that duty through a sustained pattern of negligent acts and omissions, including failing to intervene in severe bullying, ignoring parental reports, permitting staff to mistreat J.B., failing to implement 504 accommodations, and expelling J.B. for disability-related conduct without compliant procedural review.

77. Plaintiff S.B. directly observed and contemporaneously perceived Defendant's negligent conduct toward her child over an extended period.

78. As a direct and foreseeable result of Defendant's negligence, J.B. suffered severe emotional distress, including daily crying, self-harm ideation, chronic fear and anxiety, and significant emotional dysregulation.

79. As such, Plaintiffs suffered and continue to suffer emotional and financial harm.

## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

80. Plaintiffs incorporate by reference paragraphs 1 through 79.

81. Defendant engaged in extreme and outrageous conduct by, among other things: allowing students to repeatedly tell J.B. to kill himself without intervention; permitting staff to physically block J.B. from entering the school building; permitting an employee to repeatedly discard J.B.'s meals while demeaning him; allowing a teacher to deliberately fail J.B. across all subjects; and expelling a disabled child for impulsively repeating song lyrics while knowingly ignoring his disability-related needs.
82. Defendant knew or should have known that its conduct would cause severe emotional distress to J.B. and to his parents.
83. Defendant's conduct was intentional or reckless with respect to the probability of causing such distress.
84. J.B. suffered severe emotional distress as a direct and proximate result, including daily crying, self-harm ideation, fear of attending school, and significant psychological harm requiring outside support.
85. As such, Plaintiffs suffered and continue to suffer emotional and financial harm.

**COUNT IX — STATE-CREATED DANGER (42 U.S.C. § 1983)**

86. Plaintiffs incorporate by reference all paragraphs 1-85.
87. Defendant's employees acted under color of state law at all relevant times. Under the state-created danger doctrine, a government actor violates substantive due process when it affirmatively places an individual in a position of danger the individual would not otherwise have faced. *Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019).

88. To prevail, Plaintiffs must show that Defendant, by its affirmative acts, created or increased a danger J.B. faced; that Defendant's failure to protect J.B. was the proximate cause of his injury; and that the failure shocks the conscience. *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793 (7th Cir. 2015).

89. Defendant affirmatively created and increased the danger J.B. faced through a series of specific, deliberate acts, not mere inaction.

90. First, when J.B. attempted to report that other students were telling him to kill himself, school staff told him to "shut up and sit down" and removed him from class. These affirmative acts silenced J.B.'s only available mechanism for seeking safety, directly increasing the danger he faced from ongoing peer harassment.

91. Second, a school employee physically blocked J.B. from entering the school building on multiple occasions by holding the door shut against him, an affirmative act that isolated a vulnerable disabled child from supervision, safe space, and adult protection.

92. Third, following S.B.'s protected complaints to administration, Defendant's administrators and staff affirmatively escalated adverse actions against J.B., intensifying rather than reducing his exposure to a hostile and dangerous school environment.

93. Fourth, Defendant affirmatively imposed an expulsion that removed J.B. entirely from any supervised educational environment, leaving him without the institutional protections, structure, and oversight that school

attendance provided and doing so in retaliation for disability-related conduct, without the legally required procedural safeguards.

94. Each of these acts went beyond a failure to protect; each was an affirmative exercise of state authority that placed J.B. in a position of greater danger than he would have faced absent Defendant's intervention.

95. Defendant's affirmative acts were the proximate cause of J.B.'s injuries. The peer harassment escalated and continued unchecked because staff actively suppressed his reports. His physical and psychological safety was directly compromised by the building exclusion. His emotional deterioration worsened in direct response to the escalating retaliatory conduct. And his expulsion severed the last remaining layer of institutional protection available to him.

96. The conscience-shocking standard is met here. Permitting students to tell a disabled child to kill himself and then punishing him for reporting it; physically barring a child from his own school building; allowing his meals to be discarded by a trusted adult over months; permitting a teacher to deliberately fail him across all subjects; and expelling him for disability-related conduct after years of institutional retaliation, taken together, this pattern of deliberate, sustained, state-sanctioned mistreatment of a vulnerable disabled child shocks the conscience under any reasonable standard. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

97. As such, Plaintiffs suffered and continue to suffer emotional and financial harm.

## IV. DAMAGES AND INJUNCTIVE RELIEF

98. As a direct and proximate result of Defendant's conduct, J.B. has suffered: denial of a free appropriate public education; severe emotional distress; self-harm ideation and psychological trauma; educational regression and loss of academic opportunity; exacerbation of his underlying disabilities; and complete deprivation of access to in-person education following his expulsion.

99. Plaintiff S.B. has suffered severe emotional distress, economic harm, and disruption of their caregiving responsibilities as a direct result of Defendant's conduct.

100. Defendant's conduct was intentional, willful, and in reckless disregard of Plaintiffs' rights, warranting an award of compensatory and punitive damages to the extent permitted by law.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, and award the following relief:

a) A declaration that Defendant's conduct violated Title II of the ADA, Section 504 of the Rehabilitation Act, the Fourteenth Amendment, and 42 U.S.C. § 1983;

b) Injunctive relief requiring Defendant to immediately permit J.B. to return to an appropriate in-person educational placement;

c) Injunctive relief requiring Defendant to develop and implement an appropriate IEP, conduct a comprehensive evaluation, complete an FBA, and develop and implement a BIP;

d) Compensatory education for all periods during which J.B. was denied FAPE;

e) Compensatory damages for J.B.'s educational harm, emotional distress, and psychological injuries;

f) Compensatory damages for Plaintiff S.B.'s emotional distress and economic harm;

g) Punitive damages to the extent permitted by applicable law;

h) Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794a, and 42 U.S.C. § 12205;

i) Any other relief the Court deems just and appropriate.

## VI. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Curlin & Clay Law Association of Attorneys,

*/s/ Bridget M. Boland*
Bridget M. Boland (Atty No. 39170-49)
Curlin & Clay Law Association of Attorneys
8510 Evergreen Ave., Ste. 200
Indianapolis, IN 46240
Telephone (317) 202-0301
Facsimile (317) 536-3663
bboland@curlinclaylaw.com